UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ROMNEY FOR PRESIDENT, INC., *Plaintiff*, vs. STATE OF WISCONSIN, *et al.*, *Defendants*. | CASE NO. 12-cv-745<br><br>JUDGE<br><br>**Memorandum in Support of the Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction**<br><br>**(Expedited Consideration Requested)** |

The defendants have violated federal law by failing to transmit absentee ballots to military and overseas voters by September 22, 2012, as required by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and the Military and Overseas Voter Empowerment Act (the "MOVE Act"). *See* 42 U.S.C. § 1973ff-1(a)(8). This Court should issue a temporary restraining order and preliminary injunction directing the defendants to:

1. extend the deadlines by which UOCAVA voters must mail completed absentee ballots to election officials in the Jurisdiction, and by which election officials in the Jurisdiction must receive completed absentee ballots, by a number of days that is the greater of (i) five and (ii) the number of days by which the transmission of such absentee ballots by the Jurisdiction postdated the MOVE Act deadline for such transmission, and not to reject as untimely any absentee ballots received by the deadline as extended;

2. notify each military and overseas voter to whom the Jurisdiction has transmitted or will transmit an absentee ballot of the extended deadline for returning completed absentee ballots; and

1

3.  issue all orders and directives necessary to ensure that other elections officials in Wisconsin comply with and implement the temporary restraining order and preliminary injunction.

## **STANDING**

In assessing whether a party may defend the rights of a third party who is not a close blood relative, the Supreme Court considers two factors.

> The first is the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.

*Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976). Where doctors have sought to assert the rights of patients, for example, and where property owners sue to invalidate racial covenants discriminating against a third party, the Supreme Court has permitted third party standing. *Id.* at 115 (citing *Eisenstadt v. Baird*, 405 U.S. 438, 445-446 (1972); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Barrows v. Jackson*, 346 U.S. 249 (1953)).

> The other factual element to which the Court has looked is the ability of the third party to assert his own right. . . . If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent.

*Singleton*, 428 U.S. at 115-18. Where there is a "genuine obstacle" to individuals defending their own rights, "[to] require that [the right] be claimed by the [individuals] themselves would result in nullification of the right at the very moment of its assertion." *NAACP v. Alabama*, 357 U.S. 449, 459 (1958).

The first *Singleton* factor favors Romney for President, Inc. (the "Campaign Committee"). The rights of military and overseas voters to participate in federal elections is

"inextricably bound up" with the campaigns of federal candidates, including the campaigns of presidential and vice presidential candidates such as Governor Romney and Representative Ryan which are conducted through the Campaign Committee. And because the Campaign Committee has an interest in having the votes cast by military and overseas voters counted, and has developed expertise in election law and voting rights, the Campaign Committee will be "as effective a proponent of the right[s]" at issue as the military and overseas voters whose voting rights have been violated. *Singleton*, 428 U.S. at 114-15; *see* Decl. of the RNC ¶ 10.

Second, there is a "genuine obstacle" to military and overseas voters defending their own rights in this matter, especially on an expedited basis. The affected voters are, by definition, either absent from the United States or on active duty and absent from their voting residence, so their participation in expedited litigation is impracticable. Moreover, because of the delay in international mail or the impossibility of communicating with active duty members of the armed forces, in many cases military and overseas voters will not learn that the defendants have violated their UOCAVA rights until it is too late to bring an action defending their voting rights. In some cases, the affected voters may lack legal sophistication, time, or financial resources to defend their own voting rights on an expedited basis. In these circumstances, "party who is in court becomes by default the right's best available proponent." *Id.* at 115-18.

Under the *Singleton* standard, therefore, the Campaign Committee has standing to bring the claims in this action. *See Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation . . . ."); *Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir. 1973) (recognizing a candidate's standing to enforce voters' rights).

**PRIVATE ENFORCEMENT**

The U.S. Supreme Court has held:

> if there is a state deprivation of a "right" secured by a federal statute, [42 U.S.C.] § 1983 provides a remedial cause of action unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement. "We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy" for the deprivation of a federally secured right.

*Wright v. Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 423-424 (1987) (quoting *Smith* v. *Robinson*, 468 U.S. 992, 1012 (1984)).

UOCAVA and the MOVE Act create a federal right for military and overseas voters to have official absentee ballots transmitted 45 days before a federal election, and for federal campaigns to have absentee ballots transmitted to their military and overseas supporters 45 days before a federal election. Neither UOCAVA nor the MOVE Act expressly forecloses private remedies—and without an "express provision or other specific evidence from [a] statute itself that Congress intended to preclude reliance on § 1983," a court should conclude that a private remedy for violations perpetrated under color of state law are available under Section 1983. *See id.*

Since *Roanoke* was decided, federal courts have permitted aggrieved parties—including candidates, political organizations, and individual voters—to bring private suits to defend UOCAVA voting rights. *See, e.g.*, *Bush v. Hillsborough Cnty. Canvassing Bd.*, 123 F. Supp. 2d 1305 (N.D. Fla. 2000) (candidates and a political party); *United States v. Cunningham*, 2009 U.S. Dist. LEXIS 98010, 5-6 (E.D. Va. 2009) (initiated by the McCain-Palin campaign committee); *Reitz v. Rendell*, 2004 U.S. Dist. LEXIS 21813 (M.D. Pa. 2004) (two members of the armed forces serving overseas); *see also Doe v. Walker*, 746 F. Supp. 2d 667 (D. Md. 2010) (dismissing UOCAVA claim brought by overseas soldier as moot, but granting prospective relief

under parallel constitutional claims). This practice is consistent with both the reasoning in *Roanoke* and the purposes of UOCAVA and the MOVE Act. Indeed, if there were not a private remedy for violations of UOCAVA and the MOVE Act, an incumbent administration fearing a lack of support amongst military and overseas voters could effectively disenfranchise such voters by simply refusing or delaying public enforcement—which would clearly frustrate the purpose and intent of UOCAVA and the MOVE Act.

Based on the reasoning in *Roanoke* and the practice in federal courts, and to preserve the voting rights of men and women in the United States armed forces, this Court should conclude that aggrieved parties have a private right of action to enforce the voting rights arising under UOCAVA and the MOVE Act.

## **ARGUMENT ON THE MERITS: THE PLAINTIFF IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

A court may grant interim relief if a plaintiff establishes that (a) "he is likely to succeed on the merits," (b) "he is likely to suffer irreparable harm in the absence of preliminary relief," (c) "the balance of equities tips in his favor," and (d) "an injunction is in the public interest." *Winter v. Nat. Resources Def. Council*, 555 U.S. 7, 20 (2008).

In this case, the plaintiff meets these four requirements and are entitled to preliminary relief.

### I. The Plaintiff Is Likely to Succeed on the Merits.

For UOCAVA voters from whom Wisconsin elections officials received "valid[] request[s]" for absentee ballots "at least 45 days before an election for Federal office," the State is required to "transmit" those ballots "not later than 45 days before the election" (*i.e.*, by September 22, 2012). 42 U.S.C. § 1973ff-1(a)(8)(A); *see Perry v. Judd*, 471 Fed. Appx. 219, 220, 2012 U.S. App. LEXIS 980 at *2 (4th Cir. Jan. 17, 2012) (recognizing that, under the

5

MOVE Act, states "must prepare and mail absentee ballots to military and overseas voters at least 45 days before the election"); *United States v. Alabama*, 2012 U.S. Dist. LEXIS 32424 at *2 (M.D. Ala. Feb. 28, 2012) ("[T]he MOVE Act amended UOCAVA to require that States transmit absentee ballots to UOCAVA voters at least 45 days before an election for federal office to provide voters sufficient time to receive, mark, and return absentee ballots.").[1]

Although Wisconsin has delegated to municipal clerks the authority to handle absentee ballot applications and transmissions, *see* Wis. Stat. § 6.87, UOCAVA vests ultimate responsibility with the State. *See* 42 U.S.C. § 1973ff-1(a)(8) ("Each State shall . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . ."). The State "bears full responsibility" for compliance with this provision of UOCAVA. *Alabama*, 2012 U.S. Dist. LEXIS 32424 at *4 (rejecting the state's argument that it is not responsible for compliance with UOCAVA where county officials handle absentee ballot transmission); *see also Cunningham*, 2009 U.S. Dist. LEXIS 98010 at *26 (rejecting the Defendant's argument that local election officials are necessary parties in litigation because "[t]he Commonwealth of Virginia . . . is directed by UOCAVA to ensure its compliance by the local election boards"). And under Wisconsin statutes, the defendants remain responsible for overseeing the conduct of municipal elections officials and remedying violations of elections laws. Wis. Stat. §§ 5.05(1), 5.054(2).

In this case, thirty municipalities under the defendants' supervision missed the 45-day deadline, and transmitted 44 military and overseas ballots after the 45-day deadline. Decl. of

---

[1] A state may request a hardship waiver to this requirement, *see* 42 U.S.C. § 1973ff-1(g)(1), but the deadline for such requests was August 8, 2012, *id.* § 1973ff-1(g)(3)(A), except for requests that resulted from "legal contest[s]" concerning the ballot, *id.* § 1973ff-1(g)(3)(B). In any event, the defendants did not obtain a hardship waiver from the 45-day ballot-transmission deadline for the 2012 general election.

RFP ¶¶ 4-6. There is a substantial risk that the delay will prevent military and overseas voters from Wisconsin from voting in the November 2012 general election. Decl. of Sutter ¶ 9.

Theefendants therefore have violated federal law and jeopardized the fundamental right to vote of military and overseas voters, and the plaintiff's right to receive the electoral support of such voters. *Alabama*, 2012 U.S. Dist. LEXIS 32424 at *8 (holding that a state "has not complied with UOCAVA's mandate" where "numerous . . . counties failed to transmit UOCAVA absentee ballots at least 45 days prior to the federal primary election"); *cf. Cunningham*, 2009 U.S. Dist. LEXIS 98010 at *12, 22, 26-27 (holding, prior to the MOVE Act amendments, that "by failing to mail absentee ballots to UOCAVA voters thirty days or more before the November 4, 2008 election, Defendants violated UOCAVA").

In light of these facts, the plaintiff has a strong likelihood of success on the merits.

## II. Without Preliminary Relief, the Plaintiff Will Suffer Irreparable Injury.

This case is not one of harmless error caused by the State; rather, the plaintiff will suffer irreparable harm in the absence of preliminary relief. Preserving the full statutory period for the receipt, completion, and return of absentee ballots is essential to the voting rights of military and overseas voters.

Men and women in the armed forces often (a) are in specialized training programs where they are unavailable to receive mail; (b) are forward deployed overseas, where mail service takes additional time to reach the service member; (c) are transferred between bases, so that mail has to "catch up" to them; and/or (d) conduct missions in the field for extended periods of time, during which time they have no access to mail. Decl. of Sutter ¶ 7.

Because of the potential for such delays, the bipartisan U.S. Election Assistance Commission, which "serves as a national clearinghouse and resource for the compilation of

7

information and review of procedures with respect to the administration of Federal elections," 42 U.S.C. § 15322, issued a report in 2004 concluding that the statutory period is necessary to ensure that military and overseas voters would have an adequate opportunity to receive, complete, and return their absentee ballots. *See Report on Best Practices* at 2. The Military Postal Service Agency reaffirmed these conclusions during the 2010 election cycle, stating that the MOVE Act's "requirement for the states to send out ballots a minimum of 45 days in advance of the election ensures military and overseas voters will receive them in time to cast their vote." *See 2010 Postal System Analysis* at 2-1. Congress, meanwhile, has recognized that, when a state sends an absentee ballot overseas too late for the recipient to complete and return it, the voter is "clearly and effectively disenfranchised." H.R. Rep. 99-765, at 12, 1986 U.S.C.C.A.N. at 2016.

To be sure, as an alternative to casting standard absentee ballots, UOCAVA allows military and overseas voters to cast their votes on a federal write-in absentee ballot ("FWAB"). The FWAB, however, is essentially a blank piece of paper that voters may download and on which they may write the names of the offices and candidates for which they wish to vote. *See* 42 U.S.C. § 1973ff-2(a)(1); Standard Form 186 (rev. Oct. 2005), *available at* http://www.fvap.gov/resources/media/fwab.pdf. Because it imposes additional informational and administrative burdens on individual voters, the FWAB is not an adequate substitute for an official absentee ballot. Courts have, therefore, consistently held that the ability to cast a FWAB does not prevent courts from requiring states or counties to extend their deadlines for accepting completed official absentee ballots. *See, e.g.*, *Cunningham*, 2009 U.S. Dist. LEXIS 98010, at *22-23 ("[T]he Court rejects Defendants' argument that [submitting a FWAB] is the exclusive remedy . . . [T]he mere right to cast a [FWAB] neither defeats a UOCAVA claim nor remedies

8

harm caused by a State's failure to send timely absentee ballots."); *see also Doe*, 746 F. Supp. at 679 n.15 (noting that "the FWAB has significant limitations").

An order directing the defendants to extend the deadline for returning military and overseas absentee ballots is therefore necessary to prevent irreparable injury. *Alabama*, 2012 U.S. Dist. LEXIS 32424 at *13-14 (finding that irreparable harm will result from UOCAVA violations); *see also Doe*, 746 F. Supp. 2d at 682 (holding that interim relief was necessary to prevent military and overseas voters from "being irreparably deprived of their right to participate in electing candidates running for Maryland state offices"); *see also* Decl. of Sutter ¶ 9.

### III.   The Balance of Hardships Favors an Injunction.

The balance of hardships likewise favors issuing an injunction. "[T]he potential harm caused to UOCAVA voters far outweighs the burden placed upon the [defendants], which ha[ve] a legally mandated obligation to vindicate the fundamental right of [their] military and overseas constituents to vote in federal elections." *Alabama*, 2012 U.S. Dist. LEXIS 32424 at *14; *see also Doe*, 746 F. Supp. 2d at 682 (holding that the balance of hardships favors granting a preliminary injunction to military and overseas voters to protect their "fundamental constitutional rights").

To the extent that the requested relief "conflicts with [state] law, [state] law must give way. . . . Federal courts are authorized to order States to comply with federal law, and States have a duty to obey such orders." *Cunningham*, 2009 U.S. Dist. LEXIS 98010, at *33; *see also Bush*, 123 F. Supp. 2d at 1314 ("[A]ny state requirement that conflicts with the mandatory provisions of [UOCAVA] is preempted and invalid."). The displacement of preempted state laws does not tip the balance of hardships in the defendants' favor.

## IV. An Injunction Is in the Public Interest.

Ensuring that UOCAVA voters, "many of whom risk their lives at the request of the government, have the opportunity to vote is certainly in the public interest." *Alabama*, 2012 U.S. Dist. LEXIS 32424 at *14; *see also Doe*, 746 F. Supp. 2d at 682 (holding that "the public interest is served" by extending the deadline for the return of absentee ballots from military and overseas voters, to allow them "same opportunity to have their votes counted as is afforded other Maryland voters").

## REQUEST FOR EXPEDITED CONSIDERATION

In order to preserve the voting rights of military and overseas voters, the plaintiff respectfully requests that this Court give this issue expedited consideration. *See Perry v. Judd*, 471 Fed. Appx. 219, 220, 2012 U.S. App. LEXIS 980 at *2 ("This court is required to act with the utmost expedition in ruling upon the emergency motion for injunctive relief because" of the statutory deadline for "mail[ing] requested absentee ballots to military and overseas voters."); *see also Bush*, 123 F. Supp. 2d at 1317 n.28 (stating, in a UOCAVA case, "[d]ue to the exigent circumstances with regard to Florida's slate of presidential electors, the Court has rendered judgment in an expedited manner").

## **CONCLUSION**

For the reasons set forth above, this Court should grant the Plaintiff's Motion for a Temporary Restraining Order and a Preliminary Injunction.


Dated: October 12, 2012          Respectfully Submitted,

                                            **TROUPIS LAW OFFICE, LLC**

                                            By:   s/ Sarah E. Troupis
                                                              James R. Troupis, SBN 1005341
                                                               Sarah E. Troupis, SBN 1061515
                                                               8500 Greenway Blvd., Suite 200
                                                               Middleton, Wisconsin 53562
                                                               ph. 608-807-4096
                                                               jrtroupis@troupislawoffice.com

                                                               *Attorneys for Plaintiff*